[904 NYS2d 886]

Sarah C. Schreiber, Plaintiff, v Marc A. Schreiber, Defendant.

Supreme Court, Kings County, June 25, 2010

## APPEARANCES OF COUNSEL

*Wendy G. Sonneborn*, Kew Gardens, for plaintiff. *Mallow, Konstam & Nisonoff*, New York City (*Abe Konstam* of counsel), for defendant.

## OPINION OF THE COURT

DELORES J. THOMAS, J.

In this matrimonial action, plaintiff Sarah C. Schreiber moves, by order to show cause dated February 4, 2010, for an order pursuant to CPLR 3101: (a) directing that a hard disk drive in a certain office computer of defendant Marc A. Schreiber, also known as Meir Aaron Schreiber, be confiscated and deposited with the clerk of the court for a forensic examination; (b) in the alternative, permitting plaintiff's expert to copy such hard disk drive on site, and to deliver a copy of same to the clerk of the court for safekeeping; (c) prohibiting defendant, once the subject hard disk drive or a copy thereof is delivered to the clerk of the court, from conveying any of the assets which may be identified on the subject hard disk drive or a copy thereof;[1] and (d) awarding plaintiff costs and disbursements for making this request (motion sequence No. 12).

## Discovery of Information on Defendant's Office Computer Hard Disk Drive

Background

By decision and order dated December 7, 2007, the court denied plaintiff's previous request for an immediate inspection of the hard disk drives in defendant's office computers, observing that

> "[i]nasmuch as this request for relief is not in the nature of pendente lite support, the issue of defendant's compliance is denied, with leave to renew, at either a subsequent compliance conference or in a separate motion. Moreover, inasmuch as the court already appointed an appraiser to value law practice,

---

[1]. This request is made in the affirmation in support of James T. Moriarty, plaintiff's counsel, dated January 22, 2010 (at paragraph 17).

an order allowing plaintiff to inspect the hard drive on defendant's computers may well be duplicative and unnecessary" (at 37-38).

Thereafter, a court-appointed appraiser opined that the fair market value of defendant's solo law practice as of April 4, 2006 (the commencement date of the instant action) was $168,000.[2] To reach that conclusion, the appraiser examined copies of defendant's Schedule C ("Profit or Loss From Business [Sole Proprietorship]") for the years ended December 31, 2003-2005, interviewed defendant in his office, reviewed the bank statements provided by plaintiff, and reviewed/searched publicly available financial publications and databases.[3] Because the underlying data were not audited, the appraiser cautioned that

"Marc Schreiber represented to us that the information he supplied was complete and accurate to the best of his knowledge and that the financial information, as reported in the Practice's income tax returns, fairly reflects the Practice's results of operations and financial condition. *Information supplied to us has been accepted as correct without further verification, and we express no opinion on that information.*"[4]

Plaintiff now renews her demand for production of defendant's office computer hard disk drive, so that her expert can make a "mirror image" of its contents. By this process, plaintiff's expert would essentially create a "clone" of the subject hard disk drive, duplicating all programs, files, and other information contained therein, whether or not germane to this case. Plaintiff hopes to discover electronically stored evidence that defendant has not voluntarily produced during discovery.

By stipulated order dated March 9, 2010 (the stipulated order), the court directed that

"[o]n consent of parties, pending decision on motion plaintiff shall pay the defendant the cost to clone his hard drive in his office computer within ten days hereof. The original hard drive will be held by defendant's attorney pending decision on motion. Plaintiff may have observers present when hard

2. See Hoberman, Miller, Goldstein & Lesser, P.C., Appraisal Report of Marc Schreiber's Law Practice April 2006, dated February 27, 2009 (at 14) and cover letter. The Hoberman firm was appointed pursuant to the court's order dated April 23, 2007.

3. *Id*. at 6-7 (appraisal procedures; external sources of information).

4. *Id*. at 14-15 (assumptions and limiting conditions) (emphasis added).

drive is cloned but not to view."

Assuming that the stipulated order has been effectuated, plaintiff now essentially requests an examination of all computer files and file fragments on the cloned hard disk drive of defendant's office computer (the clone).

·Plaintiff's Contentions

In support of her motion, plaintiff asserts that defendant has concealed his income and assets in an attempt to avoid paying her a fair share of marital income and assets earned or acquired during the parties' 30-year marriage. Plaintiff alleges that defendant misrepresented his income and assets in his August 2006 statement of net worth as well as testified falsely at his pretrial depositions that his annual income was approximately $50,000 and that he held no securities or cash.[5] Plaintiff maintains that despite her numerous attempts to obtain from defendant full and reliable information concerning these issues, defendant has consistently declined to reveal his true financial condition. Plaintiff further asserts that the documents obtained from defendant and third parties reveal that defendant has engaged in what she characterizes as "bizarre" financial activities; namely:

- Defendant utilized multiple simultaneous professional escrow accounts and stock brokerage accounts held either in his name individually or in the name of various for-profit and not-for-profit entities that may have been affiliated with defendant.

- He failed to file his income tax returns for the years 2006, 2007 and 2008.

- He received no independent contractor tax forms from any of the lenders for whom he performed real estate closings. Rather, he deducted his legal fees from moneys funded to his escrow accounts by lenders.

- He did not maintain a separate personal checking account, but transferred any remaining funds from closings to his single operating account which he utilized to pay both his business and personal expenses.

---

**5.** Defendant's statement of net worth, affirmed August 21, 2006, valued his total assets at $1,202,637, his total liabilities at $6,101,395, and his negative net worth at $4,898,762.

- Despite his claim that his annual income was only $50,000, defendant's total annual income for each of the years 2003 through 2009 was in excess of $100,000, based on plaintiff's analysis and extrapolation of existing (but incomplete) data.

- Notwithstanding his denial that he had no credit card accounts, he may have had several credit card account balances which he had been paying at least up until May 2008.

- Regardless of his claim to the contrary, he held multiple brokerage accounts in his name and in the name of his nominees or agents.[6]

- It is likely that defendant may have concealed his assets in a corporate entity (known as Machne Menachem, Inc.) which was incorporated in July 1995 and filed for chapter 11 reorganization in December 2001.[7]

- Defendant may have held assets in overseas accounts in Australia, Israel and Switzerland.

Based on the foregoing, plaintiff posits that

"[d]efendant's mantra that his legal practice is worthless and suffering from a declining economy, will be seen as false, when viewed in conjunction with the materials plaintiff uncovered as well as those which are extremely likely to be on defendant's hard-drive. *These materials will show, upon information and belief, a thriving practice in which millions of dollars [are] routinely ferreted in and out of defendant's escrow accounts to effectuate business transactions and closings.*" (Affirmation of James T. Moriarty dated Jan. 22, 2010, ¶ 4 [emphasis added].)

Defendant's Opposition

In opposition, defendant contends that plaintiff's request is unnecessary and burdensome because defendant has already

---

**6.** Plaintiff avers in her affirmation dated January 6, 20(10), "based on documents that I have reviewed that he trades stocks on his computer and that he does this during the work day and that he works at this computer for substantial parts of the day" (¶¶ 3-4).

**7.** See *In re Machne Menachem, Inc.* (425 BR 749, 753 [Bankr Ct, MD Pa 2010]), discussing an undated corporate resolution, "apparently drafted after September 2001 and signed by Meir Aaron Schreiber as 'Vice President/ Treasurer,' " and noting that "some funds [to this entity] were run through The Schreiber Family Charitable Foundation." (*Id.* at 751.)

supplied her with an affidavit stating that he had no documents left to produce.[8] Further, defendant characterizes plaintiff's request for inspection of his computer hard disk drive as a groundless fishing expedition. Defendant maintains that if, as plaintiff asserts in her moving papers, she has proof that defendant has concealed income and assets, she should present her evidence at trial, rather than attempt to engage in further discovery based on her pure speculation and perhaps wishful thinking.

In addition, defendant avers that his statement of net worth was accurate when made, that his annual income has remained at about net $50,000, and that he has no assets other than certain shares of stock which he purchased in 2009. In his affirmation in opposition, he explains why his law practice was worth only $168,000 and defends the manner in which he conducts his business. He denies plaintiff's allegations that he has concealed assets or misstated his income. He asserts that he has no charitable or business accounts presently in use, that he has no credit cards, and that he has not been an active participant in Machne Menachem, Inc. for about 10 years. While he acknowledges that he has a securities brokerage account which was worth $68,481.68 on March 16, 2010, he asserts that it represents his separate, nonmarital property. He indicates that he will submit an updated statement of net worth before trial, as required. He concludes that as a busy lawyer working long hours to eke out a small livelihood, he "simpl[y] d[oes] not have the time to go through each and every allegation dreamed up against [him]." (¶ 68.)

The Law

In matrimonial actions, "parties are entitled to full disclosure of all financial information concerning marital assets held during the marriage, including business records, real estate transactions, examinations of accounting proce-

---

**8.** Specifically, defendant's affidavit, dated October 28, 2009, states, in relevant part: "*[T]o the best of my knowledge, to the extent that I was required to do so, pursuant to document requests,* I have submitted to the Plaintiff all documents that exist and are in my possession, or under my control and what I was able to obtain" (emphasis added).

The italicized text represents a negative gloss that defendant has placed on the express directive of the court's compliance order, dated October 19, 2009, which required that defendant "submit an affidavit or affirmation . . . that he has provided all documents in his possession, under his control or that he is able to obtain."

dures, financial records, and both hard copy and computer stored data" (*Etzion v Etzion*, 7 Misc 3d 940, 943 [Sup Ct, Nassau County 2005]). Domestic Relations Law § 236 (B) (4) (a) provides for "[c]ompulsory financial disclosure," as follows: "In all matrimonial actions and proceedings in which alimony, maintenance or support is in issue, there shall be compulsory disclosure by both parties of their respective financial states. No showing of special circumstances shall be required before such disclosure is ordered."

All discovery devices set forth in CPLR article 31 are available for use in matrimonial actions, as the broad disclosure mandate creates a situation ripe for discovery under CPLR 3101. When discovery which is sought is "material and necessary" pursuant to CPLR 3101 (a) and is not subject to claims of privilege, attorney work product, or material prepared for litigation in accordance with CPLR 3101 (b), (c) and (d), disclosure is proper and should be permitted. Nevertheless, the court is bound to "oversee the discovery process and to insure that undue prejudice and delay do not occur as the result of additional and/or potentially open-ended discovery, including unwarranted fishing expeditions" (*Shumakh v Shumakh*, 21 Misc 3d 1142[A], 2008 NY Slip Op 52482[U], *9 [Sup Ct, Kings County 2008]).

As it pertains to matrimonial matters, "electronic discovery may be crucial [in the proper cases] to determine and confirm the existence of vital information. In others, it may be a weapon of abuse which will further clog a system that is already in dire need of relief" (Rosenberg, Outside Counsel, *Electronic Discovery and the Matrimonial Case*, NYLJ, June 15, 2005, at 4, col 4). The difficulty lies in the fact that a "computer system or a hard drive [is] not . . . a mere 'thing to produce and copy,' which a party has a right to have produced for inspection under CPLR 3120. They are qualitatively different from other objects because of the difficulty of apprehending all that they contain" (Gleason and Connors, New York Practice, *First E-Discovery Demand: Access to Clone of Hard Drive?*, NYLJ, July 18, 2005, at 3, col 1).

There appear to be three reported matrimonial decisions in the context of equitable distribution and maintenance where the issue of hard drive cloning has been addressed: *Etzion v Etzion* (7 Misc 3d 940 [2005]), *R.C. v B.W.* (NYLJ, Apr. 3, 2008, at

26, col 1 [Sup Ct, Kings County, Adams, J.]), and *Byrne v Byrne* (168 Misc 2d 321 [Sup Ct, Kings County 1996]).[9]

In *Etzion* (7 Misc 3d at 941), plaintiff wife sought an order permitting her to "impound, clone and inspect [defendant's] computer servers, hard drives, individual workstation P.C., laptops and other items containing digital data." As grounds for her request, she recited in her affidavit

> "the history of defendant's alleged conduct in creating 'shell' companies, transferring ownership to his 92-year-old father, and purchasing $4 million in real estate through a convoluted transfer of funds in and out of several Channel Island trusts . . . '[as part of] a common scheme to deprive [her] of [her] fair share of marital assets' " (*id.* at 942).

In response, defendant consented to discovery of financial matters sought by plaintiff, but contended that it would result in the disclosure of irrelevant, proprietary, and privileged materials (*id.* at 944).

The court ruled that an allegation of defendant's past fraudulent conduct did not justify plaintiff's "all-encompassing" demand for full system access (*id.* at 943). While the court permitted the imaging of defendant's hard disk drives to proceed, it prevented a direct delivery of the resulting clones to plaintiff and imposed the following limitations to protect defendant's privileged and nonrelevant materials:

- Discovery was supervised by a private attorney who was appointed as the discovery referee (*id.* at 944).

- To be discoverable, the materials must have related to defendant's business or the foreign entities to which defendant allegedly transferred funds. Copying or transmission of personal records, e-mails, or other correspondence between defendant and third parties and/or defendant and his counsel was prohibited (*id.* at 944-945).

- Plaintiff's expert, accompanied by defendant's

---

**9.** Electronic discovery of documents on a hard disk drive was addressed in the context of custody and marital fault, respectively, in *Boudakian v Boudakian* (NYLJ, Dec. 26, 2008, at 27, col 3 [Sup Ct, Queens County 2008, Lebowitz, J.]) and *Moore v Moore* (NYLJ, Aug. 14, 2008, at 26, col 1 [Sup Ct, New York County 2008, Evans, J.]). Access, use, and copying of information stored in an e-mail account of an estranged spouse was considered in *Gurevich v Gurevich* (24 Misc 3d 808 [Sup Ct, Kings County 2009, Sunshine, J.]).

expert and the discovery referee, would visit defendant's offices. Plaintiff's expert would clone the hard disk drives on site and immediately turn over the clones to the discovery referee (*id.* at 944).

- At a location jointly selected by the discovery referee and the computer experts of each of the parties, "the hard drives [would] be examined. Hard copies of any business records found on such hard drives [would] be made and distributed to attorneys for both parties" (*id.* at 944-945).

- Where questions arose as to the appropriate review of a particular document, the discovery referee's determination was considered final (*id.* at 945).

- The discovery referee would keep the clones until the case was concluded, at which time the clones would be returned to defendant for disposal (*id.*).

- The review was to be completed in approximately one month (*id.*).

The *Etzion* court declined plaintiff's request to shift her $15,000 cost for the computer expert (and $15,000 more for her attorney's fees) to defendant, noting that under the CPLR the party seeking disclosure should generally bear the costs in production of the discovery material (*id.* at 945). The court directed that plaintiff bear the cost of the production of the business records she sought, subject to any possible reallocation of costs at trial, that plaintiff pay the expenses of her computer expert (including the cost of hard copy production), that defendant be responsible for the cost of his own computer expert, and that the discovery referee's fees be shared in the manner set forth in the court's prior order of appointment (*id.*).

In *R.C. v B.W.*, Justice Rachel Adams of this court considered plaintiff husband's application for production of defendant wife's home computer. Plaintiff contended that his attorney-turned-author wife was performing most of the legal work in the parties' matrimonial case and, therefore, any applications for large sums of counsel fees could only be countered by the information on her computer. He further argued that she was making no bona fide efforts to earn income to support herself and the parties' children.

Justice Adams held that although "[t]he law is clear that electronic records and information are subject to disclosure," plaintiff was not entitled to "a fishing expedition into the

[w]ife's computer," particularly as he did "not seek financial documents, records, billing statements or bank statements" (*R.C. v B.W.*, NYLJ, Apr. 3, 2008, at 26, cols 1, 3, 4). His request for documents related to his wife's application for her counsel fees and maintenance was barred by the attorney-client privilege, while his request for discovery to determine if she was looking for work—which request the court characterized as being "invasive and violative"—would not reveal probative information because she conceded that she did not intend to seek employment.

Finally, in *Byrne* (168 Misc 2d at 322), Justice William Rigler of this court held that a portable computer which belonged to the employer of defendant husband, but which he kept and used in the marital residence, was akin to a filing cabinet and could be confiscated by plaintiff wife without his consent. Information stored in the computer regarding the husband's finances and personal business records was discoverable, subject to the attorney-client privilege and any applications for a protective order (*id.* at 322-323). The court's rationale was that a home computer, similar to a file cabinet, could have been accessed by either party (*id.* at 322).

Outside the matrimonial context, courts have been loathe to sanction an intrusive examination of an opponent's computer hard disk drive as a matter of course (*see Melcher v Apollo Med. Fund Mgt. L.L.C.*, 52 AD3d 244, 245 [1st Dept 2008] ["In view of the absence of proof that plaintiff intentionally destroyed or withheld evidence, his assistant's testimony that she searched his computers, and the adequate explanation for the nonproduction of two items of correspondence, the court improperly directed the cloning of plaintiff's computer hard drives"]; *Samide v Roman Catholic Diocese of Brooklyn*, 5 AD3d 463, 465 [2d Dept 2004] [in modifying a lower court's order which granted plaintiff's motion to compel defendants to produce contents of their computer hard disk drives for in camera inspection, the appellate court directed production of paper copies of all e-mail messages relating to allegations against a certain priest]; *Matter of Maura*, 17 Misc 3d 237, 247 [Sur Ct, Nassau County 2007] [where the authenticity of a prenuptial agreement drafted by a nonparty attorney was at issue, the Surrogate's Court permitted a search of the attorney's hard disk drive, subject to the following protocol: the attorney will select its own computer expert; the expert will search, copy, print, and deliver to the court in a sealed envelope the relevant portions of the

documents from his hard disk drive; the attorney will have 10 days after delivery within which to object to the production of the documents to the parties' attorneys; the merit of any objections raised will be determined by the court; if no objections are timely raised by the attorney, paper copies of such documents will be delivered to the parties' attorneys]).

To summarize the above discussion:

> "courts are concerned about burden and will not order a wholesale turnover of a computer hard drive. They will impose limitations to address potential 'fishing' expeditions, privacy concerns as they relate to irrelevant materials, disclosure of competitive materials to ensure that such materials will not be misused, materials protected by the attorney-client privilege, work product immunity doctrine or other privileges, and inconvenience to a non-party owner of a computer. In addition, a court may require a representation that the party requesting the inspection, consistent with New York law, will pay for the costs of the production or review of the hard drive." (Berman and Zerykier, Outside Counsel, *Forensic Inspection of Computer Hard Drives Under New York Law*, NYLJ, Sept. 1, 2005, at 4, col 4.)

Discussion

The court finds that plaintiff in this case is not entitled to an unrestricted turnover of the computer hard disk drive at issue, either in the form of the original hard disk drive or in the form of its clone. Unlike a typical discovery demand which targets particular information, plaintiff's request here is overbroad as it seeks general—as well as unlimited in time—access to the entirety of defendant's business and personal data stored on his office computer. Equally important, plaintiff has proposed no discovery/issue resolution protocol. Accordingly, that branch of plaintiff's motion which is to compel production of the hard disk drive in defendant's office computer is denied with leave to renew by notice of motion, within 45 days after the date of service of the instant decision and order with notice of entry (the renewal deadline). If plaintiff wishes to renew, the sole object of her discovery will be a clone of the hard disk drive (or, more precisely, the computer files and file fragments stored thereon), assuming the same was created pursuant to the stipulated order. The original hard disk drive will remain in possession of defendant's counsel and, absent evidence that the cloning pursuant to the stipulated order was improper and/or incomplete, will not be subject to discovery.

In addition, if plaintiff wishes to renew, her renewal must contain a detailed, step-by-step discovery protocol that would allow for the protection of privileged and private material. The following is a proposed list of items such protocol should contain:

(a) Discovery Referee: The parties will have until the renewal deadline to agree on an attorney referee, preferably someone with some technical expertise in computer science, to be appointed pursuant to CPLR 3104 (b) to supervise discovery (the referee).[10] If the parties fail to agree on a referee before the renewal deadline, they will submit two names each to the court (along with a summary of the proposed referee's qualifications, not to exceed one page, and hourly rate), and the court will select a referee from among the candidates submitted.

(b) Forensic Computer Expert: The parties will have until the renewal deadline to agree on a forensic computer expert who will inspect and analyze the clone (the expert). If the parties fail to agree on an expert before the renewal deadline, they will submit two names each to the court (along with a summary of the proposed expert's qualifications, not to exceed one page, and the expert's fee structure), and the court will select an expert from among the candidates submitted. The expert will execute a confidentiality agreement (to be agreed upon by the parties) governing nondisclosure of the contents of the clone and its redelivery to defendant's counsel after completion of electronic discovery.

(c) File Analysis: The expert will analyze the clone for evidence of any download, installation, and/or utilization of any software program, application, or utility which has the capability of deleting or altering files so that they are not recoverable (a drive-wiping utility). The expert will then (i) extract from the clone all live files and file fragments, and (ii) if the files on the clone have been deleted or altered using a drive-wiping utility, will also recover all deleted files and file fragments.

(d) Scope of Discovery: Plaintiff will list the keyword and other searches she proposes to have the expert run on the files and file fragments, subject to a reasonably short time frame (to be agreed upon by the parties) in which such files or file fragments were created or modified. Plaintiff is cautioned that she

---

**10.** That rule provides, in relevant part, that "the court may permit all of the parties in an action to stipulate that a named attorney may act as referee. In such latter event, the stipulation shall provide for payment of his fees which shall, unless otherwise agreed, be taxed as disbursements."

should narrowly tailor her search queries so as to expedite discovery and reduce the costs of litigation to the parties. To illustrate, a search query for *all* documents with an .xls (Microsoft Excel) extension created or modified within a three-year period preceding the commencement of this matrimonial action will not be permitted.

(e) First-Level Review: The expert will run keyword or other searches on all of the extracted files and file fragments. After performing searches, the expert will export to CDs or DVDs a copy of the native files and file fragments which were hit by such searches, and will deliver such media to defendant's counsel to conduct a privilege review. An exact copy of the media delivered to defendant's counsel will be contemporaneously delivered by the expert to the referee. The expert will also concurrently deliver to the referee and to counsel for both parties a report (i) detailing the results of its searches, (ii) listing the file types for all files hit by the searches, with the file extensions and number of files for each, and (iii) stating whether or not it found evidence of the use of a drive-wiping utility.

(f) Second-Level Review: Within 20 days after delivery of the media containing the extracted files and file fragments, defendant's counsel will deliver to plaintiff's counsel in electronic format (to be agreed upon by the parties) all nonprivileged documents and information included in the extracted files and file fragments, together with a privilege log which identifies each document for which defendant claims privilege and describes the nature of the documents withheld (but without revealing information which is itself privileged), so as to enable plaintiff to assess the applicability of privilege.

(g) Discovery Disputes: The referee will resolve any disputes concerning relevancy and privilege. Subject to the parties' agreement, the referee's determination will be final.

(h) Cost Sharing: All costs for the expert will be borne by plaintiff, subject to any possible reallocation of costs at the conclusion of this action. Plaintiff will indicate if she is willing to bear any other discovery-related costs and, if so, specify her proposed share.

(i) Discovery Deadline: The parties should agree to a fast-track discovery schedule, subject to an outside 90-day deadline within which discovery should be completed.

(j) Retention of Clone: The discovery referee will keep the clone until the action is concluded, at which time the clone will be returned to defendant's counsel for disposal.

The court has looked at the overall circumstances of this case with an eye toward limiting disclosure to relevant documents and preserving the applicable privileges, both between defendant and his counsel as well as between defendant and his clients. A discovery protocol outlined above strives to achieve these fundamental goals.

### Other Relief

Plaintiff's request for an order directing defendant not to convey any of the assets which may be identified on the clone is denied as premature.

Lastly, plaintiff seeks an award of "costs and disbursements in bringing this application." Plaintiff does not allege any basis for her request, and defendant does not address the issue.

Pursuant to Domestic Relations Law § 237 (a):

> "the court may direct either spouse . . . to pay such sum or sums of money directly to the attorney of the other spouse to enable that spouse to carry on or defend the action or proceeding as, in the court's discretion, justice requires, having regard to the circumstances of the case and of the respective parties. Such direction must be made in the final judgment in such action or proceeding, or by one or more orders from time to time before final judgment, or by both such order or orders and the final judgment; *provided, however, such direction shall be made prior to final judgment where it is shown that such order is required to enable the petitioning party to properly proceed.* Any applications for counsel fees and expenses may be maintained by the attorney for either spouse in his own name in the same proceeding" (emphasis added).[11]

"[I]n exercising its discretionary power to award counsel fees, a court should review the financial circumstances of both parties together with all the other circumstances of the case, which may include the relative merit of the parties' positions" (*DeCabrera v Cabrera-Rosete*, 70 NY2d 879, 881 [1987]).

The court, in its discretion, denies plaintiff's request for costs and disbursements related to the instant motion without preju-

---

11. The term "expenses," as used in section 237 (a), includes "accountant fees, appraisal fees, actuarial fees, investigative fees and other fees and expenses that the court may determine to be necessary to enable a spouse to carry on or defend an action or proceeding under this section" (Domestic Relations Law § 237 [d]).

dice to submitting a subsequent application for interim attorney's fees.

## Conclusion

That branch of plaintiff's motion for an order pursuant to CPLR 3101, directing that the hard disk drive in a certain computer in defendant's office be confiscated and deposited with the clerk of the court for a forensic examination or, in the alternative, permitting plaintiff's expert to copy such hard disk drive and to deliver a copy of same to the clerk of the court for safekeeping, is denied with leave to renew upon papers responsive to the deficiencies noted herein, within 45 days after the date of service of the instant decision and order with notice of entry.

That branch of plaintiff's motion for an order directing defendant, once the subject hard disk drive or a copy thereof is delivered to the clerk of the court, not to convey any of the assets which may be identified on the subject hard disk drive or a copy thereof is denied as premature.

The remaining branch of plaintiff's motion for an award of costs and disbursements for making the instant motion is denied without prejudice to submitting a subsequent application for interim attorney's fees.

Nothing contained herein shall modify the terms of the stipulated order, dated March 9, 2010, which remains in full force and effect.